[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 20, 2011
JOHN LEY
CLERK

_____

No. 09-16216

_____

D. C. Docket No. 09-00557-CV-RDP

FREDDY LOCARNO BALOCO,
through his guardian and representative
Yaneth Ester Baloco Tapia,
INGRID KARINA SOLER URREGO,
through her guardian and representative
Nubia Yolanda Urrego Urrea,
AYLEEN PAOLOA ORCASITA ALMARALES,
STEFANY LOREN ORCASITA CORDOBA,
MARLON ALEXI ORCASITA ALMARALES,
through his guardian and representative
Elisa Almarales Viloria,
ASHLY PATRICIA ORCASITA ALMARALES,
through her guardian and representative
Elisa Almarales Viloria,
SERGIO ESTEBAN SOLER URREGO,
through her guardian and representative
Nubia Yolanda Urrego Urrea,
KATHERINE PAOLA LACARNO BALOCO,
through her guardian and representative
Yaneth Ester Baloco Tapia,

Plaintiffs-Appellants,

versus

DRUMMOND COMPANY, INC.,

DRUMMOND LTD.,
AUGUSTO JIMENEZ,
ALFREDO ARAUJO,

                                                    Defendants-Appellees.
                    _____

                Appeal from the United States District Court
                    for the Northern District of Alabama
                    _____
                            (May 20, 2011)

Before BARKETT and MARTIN, Circuit Judges, and HUNT,[*] District Judge.

MARTIN, Circuit Judge:

    We previously issued an opinion in this case. Baloco v. Drummond Co.,

Inc., 631 F.3d 1350 (11th Cir. 2011). However, the panel, on its own motion, has

decided to vacate that opinion and substitute this one so as to make three

modifications. The changes clarify our quotation of Federal Rule of Civil

Procedure Rule 17(c)(2) and the parenthetical that follows our citation of Gerrard

v. Larsen, 517 F.2d 1127, 1134–35 (8th Cir. 1975), and amends our discussion of

state law, largely through the addition of a new footnote (number 12). The opinion

is otherwise identical.

    The children of Valmore Locarno Rodriguez, Victor Hugo Orcasita Amaya,

---

[*] Honorable Willis B. Hunt, Jr., United States District Judge for the Northern District of
Georgia, sitting by designation.

and Gustavo Soler Mora, three former union leaders murdered in Colombia in 2001 ("the Children"), appeal from the dismissal of their complaint against Appellee-Defendants, Drummond Company, Inc., Drummond Ltd.,[1] Augusto Jimenez, and Alfredo Araujo.[2]  The Children allege that these Drummond entities and employees hired paramilitaries from the United Self-Defense Forces of Colombia, also referred to as the AUC, to assassinate their fathers, in violation of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350; the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350,[3] and the wrongful death laws of Colombia.  They allege that the murders of their fathers caused them damages including emotional harm, loss of companionship and financial support.

As the district court recounted, "the allegations contained in the complaint are troubling:"

> A long history of trade union violence exists in Colombia.  Shortly after the Drummond employees in Colombia successfully organized a trade union, Defendant Alfredo Araujo met with leaders of the AUC,

---

[1]  Drummond Ltd. is a subsidiary of Drummond Company, Inc., and manages Drummond's day-to-day mining operations in Colombia.

[2]  Araujo moved to quash service of the complaint but the district court denied this motion as moot in light of its dismissal of the Children's complaint.

[3] The TVPA does not separately appear in the United States Code.  However, "[t]hat the TVPA, which was published in the Statutes at Large, appears in the United States Code as a historical and statutory note to the Alien Tort Act does not make the TVPA any less the law of the land."  Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1251 (11th Cir. 2005).

including Northern Block leader Jorge Cuarenta ("Jorge 40") and his representatives to arrange for the AUC to eradicate the union through violent means. Drummond paid the AUC to carry out the destruction of the union, including the murders of Locarno, Orcasita, and Soler.

At the time, Locarno and Orcasita, President and Vice President of the union, respectively, had been in negotiations with Drummond for a year on a new contract. In the course of negotiations, pamphlets were passed out around the company labeling the union a "guerilla union," and attacking Locarno and Orcasita as supporters of guerillas. In a letter to [Drummond Ltd.], Locarno asked for security protection from the death threats he had been receiving due to the pamphlets. His request was denied by [Drummond Ltd.'s] Senior Human Resources supervisor, Ricardo Urbina Aroca.

Locarno and Orcasita also expressed concerns for their safety to Garry Drummond and other representatives of Defendants. Their request was denied despite the fact that Colombia's secret service agency, the DAS, alerted Drummond that Locarno and Orcasita were at risk of assassination.

On March 12, 2001, Locarno and Orcasita were pulled off a Drummond company bus and murdered by paramilitaries of the AUC. On October 5, 2001, shortly after becoming the new president of the union, Soler was also murdered by paramilitaries of the AUC.

Baloco v. Drummond Co., No. 07:09-cv-00557-RDP, 2009 U.S. Dist. LEXIS 129624, at *3-4 (N.D. Ala. Nov. 9, 2009).

The Children also allege a "close, symbiotic relationship between the military and paramilitaries in Colombia." In support of this allegation, the Complaint cites reports from the United States State Department, the United Nations High Commissioner for Human Rights, and Amnesty International. The

4

Children allege further:

> The close, symbiotic relationship between the Military and paramilitaries in Colombia is such that the paramilitaries are acting under color of the authority of Colombia. The paramilitaries in Colombia, including those who committed the wrongful acts alleged herein, are legal creations of the government of Colombia, and they act with support from and cooperation with the official military.

While recognizing these allegations as "troubling," the district court dismissed the Children's complaint based on res judicata and preclusion grounds and alternatively for lack of standing. First, the district court found that the claims of five[4] of the eight plaintiffs were precluded under the doctrine of res judicata. The court reasoned that those five plaintiffs were parties to a prior suit, In re Juan Aguas Romero v. Drummond Co., Inc., No. 03-cv-00575-BE-2, 2006 WL 5186500 (N.D. Ala. April 19, 2003), aff'd, 552 F.3d 1303 (11th Cir. 2008) ("Drummond I"), which the court concluded involved the same claims against the same defendants.

Separately, the district court dismissed the claims of all eight plaintiffs on the basis that they lacked standing to sue under either the ATS or TVPA. The court reasoned that because the TVPA permits recovery of damages only "on behalf of" the deceased person, the Children lacked standing to sue for their own personal damages. The court likewise dismissed the ATS claim, concluding that

---

[4] Those plaintiffs are Freddy Locarno Baloco, Katherine Paola Locarno Baloco, Marlon Alexi Orcasita, Ashly Patricia Orcasita Almarales, and Ingrid Karina Soler Urrego.

5

the ATS shares the same standing requirements as the TVPA. Before us is the

Children's appeal of these holdings.

## I. DISCUSSION

We will analyze these issues separately. In Part A we address standing, both

as a constitutional requirement and in terms of whether the Children possess a

cause of action under the ATS and TVPA. In Part B we address the applicability

of res judicata to the Children's claims.

## A. <u>Standing</u>

We begin with standing, "the threshold question in every federal case."

<u>Maverick Media Grp., Inc. v. Hillsborough Cnty, Fla.</u>, 528 F.3d 817, 819 (11th Cir.

2008) (quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 498, 95 S. Ct. 2197, 2205 (1975)).

We review <u>de novo</u> whether the Children have standing to sue. <u>See</u> <u>Region 8

Forest Serv. Timber Purchasers Council v. Alcock</u>, 993 F.2d 800, 806 (11th Cir.

1993).

"In essence the question of standing is whether the litigant is entitled to have

the court decide the merits of the dispute or of particular issues. This inquiry

involves both constitutional limitations on federal-court jurisdiction and prudential

limitations on its exercise." <u>Warth</u>, 422 U.S. at 498, 95 S. Ct. at 2205. Where, as

here, Congress has conferred a right to sue on a specified class of individuals, the

Supreme Court has at times discussed the standing inquiry as asking two questions: first, does the purported plaintiff possess Article III standing; and second, does the statute at issue grant the purported plaintiff a cause of action entitling them to seek relief under the applicable statute. Thompson v. N. Am. Stainless, LP, No. 09-291, - - - S. Ct. - - -, 2011 WL 197638, at *4–6 (Jan. 24, 2011); Havens Realty Corp. v. Coleman, 455 U.S. 363, 372–73, 102 S. Ct. 1114, 1120–21 (1982). We find that framework useful for resolving this appeal, and thus begin with a brief analysis of whether the Children possess constitutional standing, and then turn to whether they possess a cause of action under these statutes.[5]

## 1. Constitutional Standing

The requirement that a plaintiff must have standing to invoke the jurisdiction of the federal courts stems from the "case or controversy" requirement of Article III of the United States Constitution. See Lujan v. Defenders of Wildlife, 504 U.S.

---

[5] The Supreme Court has not clarified whether the standing analysis encapsulates the cause of action inquiry, or whether they are analytically distinct. Compare Warth, 422 U.S. at 500, 95 S. Ct. at 2206 ("Essentially, the standing question in [] cases [concerning statutes creating legal rights] is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief.") with Davis v. Passman, 442 U.S. 228, 239, 99 S. Ct. 2264, 2274 n.18 (1979) ("*standing* is a question of whether a plaintiff is sufficiently adversary to a defendant to create an Art. III case or controversy, or at least to overcome prudential limitations on federal-court jurisdiction . . . [while] *cause of action* is a question of whether a particular plaintiff is a member of the class of litigants that may, as a matter of law, appropriately invoke the power of the court." (internal citations omitted)). However, our analysis does not turn on whether the concepts are analytically intertwined or distinct. Rather, we use the standing/cause of action framework to answer two questions: (1) does the constitution permit the Children's suit, and (2) do the ATS and TVPA, respectively, permit the Children's suit.

555, 559, 112 S. Ct. 2130, 2136 (1992). To establish Article III standing, the Children must show that "(1) [they] ha[ve] suffered, or imminently will suffer, an injury-in-fact; (2) the injury is fairly traceable to the defendants' conduct; and (3) a favorable judgment is likely to redress the injury." Mulhall v. UNITE HERE Local 355, 618 F.3d 1279, 1286 (11th Cir. 2010) (citation omitted).

The Children easily satisfy these requirements. First, each of the Children's fathers were murdered, causing an immediate "invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual." Lujan, 504 U.S. at 560, 112 S. Ct. at 2136 (quotation marks omitted); see also Solomon v. Warren, 540 F.2d 777, 788 (5th Cir. 1976) ("Without serious dispute, children may suffer a pecuniary deprivation, apart from the loss of support and financial contributions, from the death of their parents in the loss of parental guidance and training, commonly identified as the loss of nurture.").[6]   Second, the Children allege that the defendants paid for and otherwise provided for their fathers' deaths, which more than adequately renders the Children's "injury . . . fairly traceable to the challenged action of the defendant." Lujan, 504 U.S. at 560, 112 S. Ct. at 2136 (quotation marks omitted). And third, although nothing can adequately compensate for the loss of a parent, our tort system is founded on the principle that

---

[6] Under Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court is bound by cases decided by the former Fifth Circuit before October 1, 1981.

8

monetary damages offer some recompense for a parent's untimely death. See

generally Restatement (Second) of Torts § 901 cmt. a (1979). As a result, under

the facts alleged, the Children clearly have "a stake in the controversy that is real

enough and concrete enough to entitle [them] to be heard in a federal district court

concerning [their TVPA and ATS] claim[s]." Mulhall, 618 F.3d at 1286.

## 2. The Children's Cause of Action

We turn now to whether the ATS and TVPA, respectively, provide causes of

action for the Children's suits. Here, "[t]he concept of a 'cause of action' is

employed specifically to determine who may judicially enforce statutory rights or

obligations." Passman, 442 U.S. at 239, 99 S. Ct. at 2274. To resolve this inquiry,

we start with the statutes themselves. See Bankston v. Then, 615 F.3d 1364, 1367

(11th Cir. 2010).[7]

---

[7] In so doing, we are compelled to reject the district court's determination that the standing analysis for each statute is identical. The court reached this holding by relying upon our decision in Arce v. Garcia, 400 F.3d 1340, 1345 (11th Cir. 2005) vacated on other grounds by 434 F.3d 1254 (11th Cir. 2006), where, in the narrow context of statutes of limitations, we have previously applied provisions of the TVPA onto the ATS. Id. at 1340. However, in Arce we explicitly relied upon Supreme Court precedent that instructed us to adopt statutes of limitations from analogous state or federal law. Id. at 1345 (quoting Reed v. United Transp. Union, 488 U.S. 319, 324, 109 S. Ct. 621, 635 (1989); DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 172, 103 S. Ct. 2281, 2294 (1983)). But these cases do not compel us to give similar consideration in the context of formulating applicable standing requirements. In any event, we have recognized previously that fundamental distinctions between the statutes render the TVPA ill-suited for establishing the elements of ATS standing. See Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1263–64 (11th Cir. 2009) (recognizing that "the TVPA is broader than the ATS in that the TVPA allows citizens, as well as aliens, to seek remedy in federal court for official torture"); Romero, 552 F.3d at 1316 ("both [the ATS and the TVPA] define torture and each statute provides a means to recover for torture as that term separately draws its meaning

9

**(i) Alien Tort Statute**

The ATS states simply: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. The statute "is jurisdictional and does not create an independent cause of action." Romero v. Drummond Co., Inc., 552 F.3d 1303, 1315 (11th Cir. 2008). Rather, "the [ATS's] jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S. Ct. 2739, 2761 (2004).

We have previously explained that there are three elements to a proper ATS claim. Specifically, "[t]o obtain relief under the AT[S], [the] plaintiff[] must be (1) an alien, (2) suing for a tort, which was (3) committed in violation of international law." Aldana, 416 F.3d at 1246 (citing Abebe-Jira v. Negewo, 72 F.3d 844, 847 (11th Cir. 1996)).[8] At the motion to dismiss stage, where we must accept all

from each statute" (quoting Aldana, 416 F.3d at 1252)); Aldana, 416 F.3d at 1252 (noting that in certain cases differences between the ATS and TVPA "might actually make a difference").

[8] Although we used the term "violation of international law" in the Aldana opinion, it is clear that only a narrow class of international law violations constitute causes of action pursuant to the ATS. Sosa, 542 U.S. at 725, 124 S. Ct. at 2761–62 ("courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized."); Sinaltrainal, 578 F.3d at 1262 ("the ATS . . . empowers

10

factual allegations as true and construe them in the light most favorable to the plaintiff, Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010), the Children have adequately pled a cause of action cognizable under the ATS. To begin, the complaint identifies each plaintiff as an alien currently residing in either Canada or Colombia.[9] Next, as discussed above, see supra at 3–4, the complaint alleges an intricate and vindictive plot, orchestrated by the defendants, that ultimately led to the assassinations of the Children's fathers. If true, such conduct establishes a violation of international law sufficient for purposes of triggering ATS liability. Cabello, 402 F.3d at 1154 (collecting authorities showing that "torture, crimes against humanity, and cruel, inhumane, or degrading punishment [are] a part of the United States and international law"); see also id. at 1158 (explaining that extrajudicial killing is actionable under ATS and TVPA "based on direct and indirect theories of liability"). It is thus no surprise that the Northern District of Alabama concluded in prior litigation against these defendants that this misconduct would constitute a violation of the law of nations sufficient to fit within the ATS. Estate of Rodriquez v. Drummond Co., Inc., 256 F. Supp. 2d

---

federal courts to entertain 'a very limited category' of claims" alleging violations of the law of nations (citations and footnote omitted)); Cabello v. Fernandez-Larias, 402 F.2d 1148, 1154 (11th Cir. 2005).

[9] Freddy Locarno Baloco and Katherine Paolo Locarno Baloco both reside in Canada, where they have been given refugee status.

11

1250, 1261 (N.D. Ala. 2003).

For these reasons, and insofar as we are bound to accept the Children's well-pleaded allegations as true, we conclude that the Children have adequately pled a cause of action cognizable under the ATS. We therefore reverse the district court's conclusion that the plaintiffs lack standing under the ATS.

**(ii) Torture Victim Protection Act**

Albeit for different reasons, we also reverse the district court's conclusion that the Children lack standing under the TVPA. Our review of both the statute's plain text as well as its legislative history convinces us that the Children may litigate their TVPA claim as "person[s] who may be a claimant in an action for wrongful death." 28 U.S.C. § 1350 note § 2(a)(2).

The TVPA differs from the ATS in certain crucial ways. Whereas the ATS is a jurisdiction conferring statute, "the [TVPA] provides a cause of action for torture and extrajudicial killing." Romero, 552 F.3d at 1315. Specifically, the statute imposes liability, on the following terms, upon:

(a) . . . An individual who, under actual or apparent authority, or color of law, of any foreign nation–

(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative,

12

or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a). Additionally, the statute provides definitions for the

conduct it regulates. First, the statute defines torture to be:

(b) Torture.--For the purposes of this Act--
(1) the term 'torture' means any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind; and
(2) mental pain or suffering refers to prolonged mental harm caused by or resulting from--
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
> (C) the threat of imminent death; or
> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

28 U.S.C. § 1350 note § 3(b).

Second, the statute defines "extrajudicial killing" as:

(a) . . . a deliberated killing not authorized by a previous judgment

13

pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note § 3(a). That the TVPA and ATS employ different definitions of "torture" and "extrajudicial killing" has consequences. As we have explained, the difference means "each statute provides a means to recover for torture [and extrajudicial killing] as [those] term[s] separately draw[] [their] meaning[s] from each statute." Romero, 552 F.3d at 1316 (quotation marks omitted). For this reason, the TVPA is not the exclusive remedy for claims of extrajudicial killing. Id.

Two other features also distinguish the TVPA from the ATS. First, the TVPA empowers both United States citizens and aliens to recover for acts of torture and extrajudicial killing. Cabello, 405 F.3d at 1154 ("[T]he TVPA extended the [ATS], which had been limited to aliens, to allow citizens of the United States to bring suits for torture and extrajudicial killings in United States courts."). Second, "[t]here is an express requirement of state action in the [TVPA]," such that a private actor can be held liable only when "there [exists] a symbiotic relationship between [that] private actor and the government." Romero,

14

552 F.3d at 1316–17.[10]

The upshot of all of this is that in order to obtain relief for an extrajudicial killing pursuant to the TVPA, a plaintiff must be: (1) a legal representative or any person who may be a claimant in an action for wrongful death; (2) of a victim of an extrajudicial killing; (3) committed by an individual acting "under actual or apparent authority, or color of law, of any foreign nation."  A plaintiff who satisfies these elements possesses a cause of action under the TVPA.

The parties' dispute centers upon whether the Children are proper "claimant[s] in an action for wrongful death" as that phrase is used in the TVPA. Now at the pleadings stage of this case, we are convinced they are.  The statute provides that the perpetrator of an extrajudicial killing can be held liable for "<u>damages</u> to the individual's legal representative, <u>or</u> to any person who may be a claimant in an action for wrongful death."  § 1350 note § 2(a)(2) (emphasis added). This circuit has held that the use of the disjunctive "or" in statutes should be read as creating two different alternatives that should be treated separately.  See <u>Rine v. Imagitas, Inc.</u>, 590 F.3d 1215, 1224 (11th Cir. 2009) (citing <u>United States v. Harmas</u>, 974 F.2d 1262, 1266 (11th Cir. 1992)).  As applied to the TVPA, then, the

_____

[10] State action does not, however, require proof of widespread government misconduct. <u>See</u> <u>Romero</u>, 552 F.3d at 1317 ("a plaintiff may prove [the predicate] relationship . . . by presenting evidence of the active participation of a single official.").

15

disjunctive use of the term "or" in § 2(a)(2) establishes that a defendant can be held liable for damages to the legal representative of the victim <u>or</u> for damages to a person who has shown that he or she could be a claimant in a wrongful death action for the victim. In other words, the TVPA expressly creates a *separate* cause of action for the wrongful death claimant through which "any person" fitting that description can sue for TVPA damages.

This construction finds support in the statute's underlying purpose. In enacting the TVPA, Congress explained that the Act would "protect[] . . . human rights by establishing a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Torture Victim Protection Act, Public Law No. 102-256, 106 Stat. 73 (Jan. 3, 1992). This suggests that the focus of the TVPA is thus the torturer and the extrajudicial killer, and the statute's intent is to deter their tortious conduct. This purpose is better served by allowing more than one affected plaintiff to bring separate lawsuits.

Furthermore, the TVPA's legislative history supports this result. Both the House and Senate Reports accompanying the TVPA set forth that the Act supports multiple claims for recovery. <u>See</u> H.R. Rep 102-367(I) at 4 (1991), <u>reprinted in</u> 1992 U.S.C.C.A.N. 84, 87 ("In cases of extrajudicial killing, . . . the victim[']s 'legal representative' <u>and</u> 'any person who may be a claimant in an action for

16

wrongful death' may bring suit." (emphasis added)); S. Rep. 102-249, at 7, 1991 WL 258662 (1991) ("The legislation permits suit by the victim or the victim's legal representative or a beneficiary in a wrongful death action." (emphasis added)). That the statute permits multiple suits is a strong indication that Congress intended for appropriate wrongful death claimants to be able to sue *alongside* representatives of the deceased, as our construction permits. Certainly, allowing multiple suits furthers the statute's intent to hold torturers and extrajudicial killers "legally accountable." See 138 Cong. Rec. S2667 (daily ed. Mar. 3, 1992) (statement of Sen. Arlen Specter).

Wrongful death claimants are thus eligible to bring suit for damages under the TVPA.[11] The final inquiry, then, is whether the Children in this case are in fact

---

[11] The district court, relying on the reasoning of the United States District Court for the District of Columbia, reached an opposite conclusion by construing the TVPA's description of *who* may bring suit as setting forth *what* damages a proper plaintiff may recover. See Fisher v. Great Socialist People's Libyan Arab Jamahiriya, 541 F. Supp. 2d 46, 54 (D.D.C. 2008) (Kennedy, J.); Hurst v. Socialist People's Libyan Arab Jamahira, 474 F. Supp. 2d 19, 30 (D.D.C. 2007) (Kennedy, J.). Specifically, these courts construe the statute's legislative history to limit recoverable damages to those available to the decedent, because the statute envisions suits brought "on behalf of" the victim. Fisher, 541 F. Supp. 2d at 54; Hurst, 474 F. Supp. 2d at 30; see H.R. Rep 102-367(I), at 4 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 87; S. Rep. 102-249, at 6 (1991)

We do not read the statute to be so limited. To be sure, Congress specified that "any person who may be a claimant in an action for wrongfully death" is eligible to bring suit pursuant to the statute, but there is no indication that such individual's eligibility as a wrongful death claimant also informs the relief available to him. See 28 U.S.C. § 1350 note § 2. Here, the statute's uniform use of the term "damages" throughout section (2) suggests that Congress did not intend to limit a plaintiff's damages when she appeared as a "wrongful death claimant." 28 U.S.C. § 1350 note § 2; see MDY Indus., LLC v. Blizzard Entm't, Inc., Nos. 09-15932, 09-16044, - - - F.3d - - -, 2010 WL 5141269, *22 n.8 (11th Cir. Dec. 14, 2010) ("a legislative body

proper wrongful death claimants. Although "we start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law," City of Milwaukee v. Illinois, 451 U.S. 304, 317, 101 S. Ct. 1784, 1792 (1981), Congress did not explicitly define, nor is it apparent from the face of the TVPA, how a court should properly ascertain who is a "claimant in an action for wrongful death." Neither can we discern from the statute itself whether Congress intended state law or federal law to supply the meaning of "claimant in an action for wrongful death." See De Sylva v. Ballentine 351 U.S. 570, 580, 76 S. Ct. 974, 980 (1956) ("The scope of a federal right is, of course, a federal question, but that does not mean that its content is not to be determined by state, rather than federal law.").

Where the federal statute itself does not elucidate the plain meaning of a particular provision, a statute's Congressional history may assist a court in

generally uses a particular word with a consistent meaning in a given context" (quotations marks omitted)). Congress appears to have contemplated a uniform damages rule tailored to the purposes of the TVPA.

Our previous encounters with the TVPA have recognized as much. In Cabello v. Fernandez-Larios, we affirmed an award for $4 million dollars for violations cognizable under the ATS and TVPA. 402 F.3d 1148, 1151, 1156–58 (11th Cir. 2005). We explained that these damages constituted both compensatory and punitive awards, and did not question their propriety despite their lack of a nexus to principles of state and federal wrongful death litigation. Id. As a result, although we cannot speculate as to any damages that may or may not be warranted in this case, Cabello makes clear that their appropriate measure is not limited by the Children's status as wrongful death claimants. See also Abebe-Jira, 72 F.3d at 848 ("[T]he Alien Tort Claim Act establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law."); id. at 846–48 (affirming verdict of $200,000 in compensatory damages and $300,000 in punitive damages).

18

determining the appropriate definition to apply. For example in <u>Taylor v. United States</u>, the Supreme Court considered the meaning of the undefined term "burglary" as it was used in 18 U.S.C. § 924(e), a federal sentencing enhancement statute. 495 U.S. 575, 579-98, 110 S. Ct. 2143, 2148–57 (1990). After first noting that it was not possible to discern from the statute itself whether Congress intended a particular state's definition or some other uniform meaning of burglary to apply to this federal statute, the Court examined the statute's extensive legislative history. <u>Id.</u> at 580–90, 110 S. Ct. at 2148–54. The Court then gleaned from the legislative history that Congress must have intended for the term "burglary" to be defined by its generic meaning as used in the criminal codes of most states. <u>Id.</u> at 598, 110 S. Ct. at 2157.

The House and Senate Committee Reports accompanying the TVPA legislation also speak directly to Congress's intentions. In explaining the wrongful death claimant provision of the TVPA, the report issued by the House of Representatives Committee on the Judiciary states that "[c]ourts may look to state law for guidance as to which parties would be proper wrongful death claimants." H.R. Rep. No. 102-367(I), at 4 (1991). The Senate Committee Report similarly explained "[t]he term 'beneficiary in a wrongful death action' is generally intended to be limited to those persons recognized as legal claimants in a wrongful death

19

action under Anglo-American law." S. Rep. No. 102-249, at 7 (1991). In addition, the Senate Report also elaborated that:

> Where application of Anglo-American law would result in no remedy whatsoever for an extrajudicial killing, however, application of foreign law recognizing a claim by a more distant relation in a wrongful death action is appropriate. In re Air Crash Disaster Near New Orleans, Louisiana, on July 9, 1982, 789 F.2d 1092, 1097–98 (5th Cir. 1986) (recognizing claim of nephew for wrongful death of aunt where Louisiana law on wrongful death action would have afforded no remedy).

Id. at n.10. Thus, Congress's intent, as evinced in the House and Senate reports, is that state law should govern the determination of whether a plaintiff is a claimant in an action for wrongful death and, where state law would provide no remedy, a court may apply the foreign law that would recognize the plaintiff's claim.

We must therefore first determine whether the plaintiffs are wrongful death claimants under Alabama law. Although the TVPA instructs courts to look to "state law" to determine the parties' status as wrongful death claimants, it does not specify whether a court should apply the state's "whole law," including its choice-of-law provisions, or only its substantive "internal law." We need not resolve which approach to apply in this case, because ultimately under either framework Colombian law applies.[12]

---

[12] Application of Alabama's choice-of-law provisions leads us to apply Colombian law. Alabama adheres to the doctrine of *lex loci delicti*, such that in an action for wrongful death a plaintiff's substantive rights are determined according to the law of the forum where the injury

20

The Children alleged in their complaint that they are "legal beneficiaries" under Colombian law, with standing to sue for their personal damages. In further support of this proposition, they attached to their pleadings filed in response to the Motion to Dismiss, an affidavit containing the "legal opinion" of Pedro R. LaFont Pianetta, a former Justice on the Supreme Court of Colombia. The record does not reflect that the appellees have disputed the Children's assertion that they are proper wrongful death claimants under Colombian law; Mr. Pianetta's conclusions to that effect; or Mr. Pianetta's qualifications to render this opinion. After thorough consideration, we conclude that the Children have properly alleged their entitlement to proceed as wrongful death claimants under Colombian law.[13] See

occurred. See Northeast Utilities, Inc. v. Pittman Trucking Co., 595 So. 2d 1351 (Ala. 1992); Powell v. Sappington, 495 So. 2d 569, 569–70 (Ala. 1986). For this reason, applying Alabama choice-of-law rules requires us to determine whether the Children are proper wrongful death claimants under Colombian law.

We reach the same result applying Alabama's substantive law. First, we would find that the Children are not proper wrongful death complainants under Alabama's internal law. See Ala. Code. § 6-5-410(a) (only a "personal representative" may bring a wrongful death action). Thus, the Children would find themselves with "no remedy whatsoever" under Anglo-American law. As instructed by the Senate Committee Report in footnote 10, we would then determine whether the Children possessed a remedy under foreign law, which in this case the parties concede to be that of Colombia. S. Rep. No. 102-249, at 7 n.10.

[13]As mentioned, the Children alleged that they were proper legal beneficiaries under the law of Colombia, and at the pleadings stage, we accept this allegation as true. With regard to the affidavit of Mr. Piannetta, Federal Rule of Civil Procedure Rule 44.1 permits us, in determining foreign law, to "consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." This Rule further provides that such a determination of foreign law should be treated as a ruling on a question of law. Id.; see Trinidad Foundry & Fabricating, Ltd. v. M/V K.A.S. Camilla, 966 F.2d 613, 615 (11th Cir. 1992) (considering affidavit from a solicitor of the Supreme Court of England and Wales at the pleadings stage).

21

generally Ramsay v. Boeing Co., 432 F.2d 592, 599–602 (5th Cir. 1970) (relying on expert testimony to interpret foreign law).

Having concluded that the Children adequately plead a TVPA violation, we also reverse the district court's finding that the Children lack standing to litigate their TVPA claim.

B.     **Res Judicata**

Because of our conclusion that the Children have standing to bring their claims for damages stemming from the deaths of their fathers, we must now address the district court's finding that the claims of five of the eight plaintiffs are barred by the doctrine of res judicata. We have concluded that the district court resolved the issue prematurely. The pleadings alone are simply insufficient to assure us that those asserting claims for the minor children in Drummond I have interests identical to those being asserted by the Children in this action. See generally Green v. Jefferson County Com'n, 563 F.3d 1243, 1253 (11th Cir. 2009).

What should be obvious—the identities and interests of the plaintiffs in the prior Drummond I suit—is not so because the family members of the deceased union leaders in that case were permitted to assert their claims anonymously as "John Does" and "Jane Does" to protect their safety. In the Third Amended Complaint filed in that action, each of the John or Jane Doe plaintiffs identified

22

themselves merely as the "legal heirs" to the three murdered union leaders, Locarno Rodriguez, Orcasita Amaya, and Soler Mora. The district court in Drummond I then ordered the plaintiffs to file under seal a "Notice of Identity of Plaintiffs," which they did, and the Notice was incorporated by reference within the Third Amended Complaint. In that Notice, the Drummond I plaintiffs identified the various John and Jane Does by their true names and relationships with the murdered victims. For example, Jane Doe I is identified as "(1) Josefina Larios Henriquez, the legal wife of Valmore Locarno, and (2) the child of Josefina and Valmore." The other John and Jane Does were identified in a similar fashion.

In light of the minority status of the plaintiffs in Drummond I, our inquiry into the "substantial identity of the parties" in the two cases requires more than one step. Even if we assume that the five children whose claims the district court dismissed on res judicata grounds are the same individuals identified as the children of the deceased in the Drummond I suit, this does not necessarily resolve the question of whether they were parties in the prior suit for the purposes of imposing a res judicata bar. Because at the time of the filing of the suit in Drummond I these five children were minors (and still are), they did not have the capacity to sue in their own right. Rather, Federal Rule of Civil Procedure 17(c)(2) provides that a minor may sue (or be sued) through a "duly appointed

23

representative," by a "next friend," or by a "guardian ad litem," and instructs district courts that they "must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action." See Roberts v. Ohio Cas. Ins. Co., 256 F.2d 35, 38–39 (5th Cir. 1958). Certainly, the mere listing of a child on a complaint as a plaintiff does not alone ensure that the child is a proper party in that suit. Compare Burke v. Smith, 252 F.3d 1260, 1262–64 (11th Cir. 2001) (noting that a minor in a wrongful death suit was "otherwise represented" for purposes of Rule 17(c) by her mother who brought the action "by and through her mother and next friend"), with Roberts, 256 F.2d at 38–39 (setting forth obligation of district court to ensure adequate representation).

There is nothing on the face of the Third Amended Complaint in Drummond I or the Notice of Identities of Plaintiffs that would allow us to conclude that the children-plaintiffs in that case sued either by a "next friend" or through a guardian ad litem or that the court "issued another appropriate order" on their behalf. Although their mothers were also plaintiffs in Drummond I, we cannot presume that they intended to represent their children's separate legal interests because the Notice did not indicate that the children were present in the suit "by and through their mother and next friend." We have found nothing in the complaint or any

24

other document for which we may take judicial notice that would confirm that the legal interests of the <u>Drummond I</u> children were properly represented by a guardian ad litem or other court appointed representative.  For this reason, and at this stage of the proceedings when we are confined to the pleadings, we cannot conclude that the Children were also parties to the <u>Drummond I</u> suit.  Cf. <u>Gerrard v. Larsen</u>, 517 F.2d 1127, 1134–35 (1975) (8th Cir. 1975) (factual determination necessary to determine whether parties "participated fairly and adequately" in prior litigation).  As a result, we reverse the district court's dismissal of the Children's TVPA claims to the extent that it concluded on a motion to dismiss that the doctrine of res judicata precluded the Children from proceeding with this case, and remand for further factual development as to the scope, if any, of the Children's involvement in the <u>Drummond I</u> litigation.

### III.  CONCLUSION

For these reasons, we conclude that the district court's dismissal of the Children's complaint for lack of standing on their TVPA and ATS claims is due to be REVERSED.  We also reverse the district court's dismissal of the TVPA and ATS claims of five of the Children on res judicata grounds, and we REMAND this case for further proceedings.

**REVERSED and REMANDED.**