[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15268

_____

D.C. Docket No. 7:09-cv-00557-RDP

FREDDY LOCARNO BALOCO;
KATHERINE PAOLA LOCARNO BALOCO,
through her guardian and representative Yaneth
Ester Baloco Tapia; AYLEEN PAOLA
ORCASITA ALMARALES; STEFANY LOREN
ORCASITA CORDOBA; MARLON ALEXI
ORCASITA ALMARALES, through his guardian
and representative Elisa Almarales Viloria;
ASHLY PATRICIA ORCASITA ALMARALES,
through her guardian and representative Elisa
Almarales Viloria; SERGIO ESTEBAN SOLER
URREGO; INGRID KARINA SOLER URREGO;
GREYSI PAOLA LOCARNO LARIOS; GUSTAVO
ALBERTO LOCARNO LARIOS; LINDA TERESA
ORCASITA PINEDA; VANESSA KATHERINE
ORCASITA PISCCIOTY,

Plaintiffs-Appellants,

versus

DRUMMOND COMPANY, INC.;
DRUMMOND LTD.; AUGUSTO JIMENEZ;
JAMES ADKINS; MIKE TRACY,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(September 23, 2014)

Before ED CARNES, Chief Judge, and TJOFLAT, Circuit Judge, and EVANS,[*]

District Judge.

EVANS, District Judge:

Plaintiffs' First Amended Complaint alleges the following.

Plaintiffs/Appellants (hereinafter "Plaintiffs") are the children and heirs of three

men (Valmore Locarno Rodriquez, Victor Hugo Orcasita Amaya, and Gustavo

Soler Mora)[1] who worked for Defendant Drummond Ltd. at Drummond's coal

mining operation in Colombia, South America.  The three men were officials of a

union, Sintramienergetica.  They were murdered in 2001 in Colombia.

The central thrust of Plaintiffs' case is that the murders were committed by

paramilitaries of the AUC[2], an organization affiliated with Colombia's military

and which, together with the military, provided security against guerilla attacks for

_____

[*]The Honorable Orinda Evans, United States District Judge for the Northern District of
Georgia, sitting by designation.

[1]We will refer to them as Locarno, Orcasita, and Soler.

[2]Autodefensas Unidas de Colombia.

2

Drummond's coal mining facility and operations. Plaintiffs claim that the murders occurred in the context of a violent armed conflict between the AUC and the FARC, a leftist guerilla organization; hence, they classify the murders as war crimes. Plaintiffs allege that Drummond aided and abetted or conspired with the AUC by directly funding some of its operations and that it collaborated with the AUC to commit these murders. Plaintiffs' claims were brought under the Alien Tort Statute ("ATS"[3]), 28 U.S.C. § 1350 (Counts One and Two), the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note § 2(a) (Count Three), and the wrongful death law of Colombia (Count Four).

The Defendants/Appellees (hereinafter "Defendants") are: Drummond Company, Inc., a closely-held corporation with its principal place of business in Birmingham, Alabama; Drummond Ltd., a wholly-owned subsidiary of Drummond Company, Inc., which has its principal place of business in Alabama and which manages Drummond's day-to-day coal mining operation in Colombia; Augusto Jimenez, a domiciliary of Colombia, who at relevant times was the President of Drummond, Ltd.'s Colombia branch; and Mike Tracy[4], who at

---

[3]The term "ATS" used in this opinion also refers to the "Alien Tort Claims Act."

[4]The district court granted Tracy's motion to dismiss in its September 12, 2012 order due to an agreement that if the Drummond entities prevailed on their res judicata defense, the claims against Tracy would be dismissed also. This was a dismissal with prejudice. Plaintiffs' notice of appeal is inclusive of claims against Tracy.

3

relevant times was the Director of Mining Operations for Drummond Company, Inc. Defendant James Adkins, the former Director of Security for either Drummond Company, Inc. or Drummond Ltd., was dismissed without prejudice on July 6, 2012. Alfredo Araujo, the Director of Community Relations for Drummond Ltd., was once a Defendant but was dropped from the case when the complaint was amended.

Plaintiffs appeal the district court's September 12, 2012 order which (a) struck declarations filed in opposition to Defendants' motion for summary judgment, (b) granted the motion for summary judgment (which pertained to all claims of the first eight Plaintiffs), and (c) granted Defendants' motion to dismiss (which pertained to all claims of the remaining four Plaintiffs). They appeal the final judgment in Defendants' favor which was entered on September 12, 2012. The district court's reasoning in granting Defendants' motions was that all of Plaintiffs' claims are barred by res judicata.

Before turning to analysis of Plaintiffs' claims of error, we will first consider the impact of the United States Supreme Court's April 13, 2013 decision in Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, on Counts One and Two, both of which were brought under the jurisdictional aegis of the ATS. Following resolution of that issue, we will turn to Plaintiffs' claims of error. For

4

the reasons set forth below, we conclude that the district court did not abuse its discretion in striking the declarations and that it did not err in granting Defendants' motion for summary judgment and Defendants' motion to dismiss. For the reasons set forth below, we affirm the district court's rulings dismissing the TVPA and Colombian wrongful death claims. The ATS claims are dismissed without prejudice under Rule 12(b)(1), Federal Rules of Civil Procedure. We affirm the judgment in Defendants' favor.

## THE IMPACT OF KIOBEL

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. While the ATS grants jurisdiction to pursue a violation of the law of nations, it is well settled that it does not empower a cause of action for just any alleged violation of the law of nations. Rather, "[t]he [ATS's grant of jurisdiction] is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time [of its enactment]." Sosa v. Alvarez-Machain, 542 U.S. 692, 724, 124 S. Ct. 2739, 2761 (2004); Baloco ex rel. Tapia v. Drummond Co., Inc., 640 F.3d 1338, 1344 (11th Cir. 2011) (hereinafter "Baloco") (citation omitted).

5

The Supreme Court in Sosa identified only three cognizable violations of the law of nations under the ATS: (1) violations of safe conducts; (2) offenses against ambassadors; and (3) piracy. Sosa, 542 U.S. at 724, 124 S. Ct. at 2761. It did leave "the door . . . ajar [for the judicial power to consider further law of nations violations] subject to vigilant doorkeeping." Id. at 729, 124 S. Ct. at 2764. This circuit has recognized torture and extrajudicial killing as violations of the law of nations, thus expanding the "very limited category" of cognizable claims under the ATS allowed by Sosa. Id. at 720, 124 S. Ct. at 2759; see, e.g., Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1265-66 & n.15 (11th Cir. 2009) (torture and murder of Colombian trade union leaders perpetrated in the course of war crimes violates the law of nations and is actionable under the ATS) abrogated in part by Mohamad v. Palestinian Auth., 132 S. Ct. 1702 (2012); Romero v. Drummond Co., 552 F.3d 1303, 1316 (11th Cir. 2008) (extrajudicial killing is actionable under the ATS if committed in violation of the law of nations); Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1247 (11th Cir. 2005) (torture claims, unlike arbitrary detention and cruel, inhuman, degrading or punishment claims, can support a cause of action under the ATS); Cabello v. Fernandez–Larios, 402 F.3d 1148, 1154, 1158 (11th Cir. 2005) (torture and extrajudicial killing).

Pursuant to the ATS's grant of jurisdiction and this circuit's precedent, the district court had subject matter jurisdiction over Plaintiffs' claims alleging violation of the law of nations based on torture and extrajudicial killings in the course of war crimes. In Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659 (Apr. 17, 2013), the United States Supreme Court determined that the ATS may not be used to sue for violations of the law of nations occurring within the territory of a sovereign other than the United States where the ATS claim does not "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application." Id. at 1669. When Kiobel was announced, the briefing in this case had already concluded. We directed the parties to address the effect of Kiobel in additional briefs. After considering the parties' arguments, we conclude, as explained below, that the claimed violations of the law of nations do not meet the test established by Kiobel; those claims must be dismissed.

In Kiobel, the petitioners—a group of Nigerian nationals residing in the United States—filed suit in the United States District Court for the Southern District of New York against certain Dutch, British, and Nigerian corporations under the ATS. 133 S. Ct. at 1662. The petitioners alleged that those corporations "aided and abetted the Nigerian Government in committing violations of the law

7

of nations in Nigeria." Id. The question before the Supreme Court was "whether and under what circumstances courts may recognize a cause of action under the [ATS], for violations of the law of nations occurring within the territory of a sovereign other than the United States." Id. at 1662.

Chief Justice Roberts, writing for the Court, determined that the presumption against extraterritorial application applies to claims brought under the ATS. Id. at 1664-65, 1669.[5] With this in mind, the Supreme Court affirmed the dismissal of the petitioners' claims, concluding:

> "[T]here is no clear indication of extraterritoriality here," and petitioners' case seeking relief for violations of the law of nations occurring outside the United States is barred.
> . . . .
> On these facts, all the relevant conduct took place outside the United States. And even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application. Corporations are

---

[5]Chief Justice Roberts explained:

> To begin, nothing in the text of the statute suggests that Congress intended causes of action recognized under it to have extraterritorial reach. The ATS covers actions by aliens for violations of the law of nations, but that does not imply extraterritorial reach—such violations affecting aliens can occur either within or outside the United States. Nor does the fact that the text reaches "*any* civil action" suggest application to torts committed abroad; it is well established that generic terms like "any" or "every" do not rebut the presumption against extraterritoriality.

Id. at 1665 (emphasis in original); see also id. at 1666 ("Nor does the historical background against which the ATS was enacted overcome the presumption against application to conduct in the territory of another sovereign.").

8

often present in many countries, and it would reach too far to say that mere corporate presence suffices. . . .

Id. at 1669 (internal citations omitted).

After careful consideration of the parties' briefs, we conclude that allowing Plaintiffs' ATS claims to proceed under the facts of this case would run afoul of the presumption against extraterritorial application.

While the presumption can be defeated by claims that "touch and concern the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application," id., these circumstances are not present here.  First, the extrajudicial killings and war crimes asserted in the First Amended Complaint occurred in Colombia.  Second, although the two Drummond entities, Adkins, and Tracy are United States nationals, the majority in Kiobel did not place significant weight on the defendants' nationality; certainly none sufficient to warrant the extraterritorial application of the ATS to situations in which the alleged relevant conduct occurred abroad.[6]

It is undisputed that the killings in this case occurred in Colombia; however, Plaintiffs contend that at least some of the relevant conduct transpired in the

---

[6]The United States Court of Appeals for the Second Circuit has held that the rule of law applied in Kiobel does not turn on a defendant's citizenship.  See, e.g., Balintulo v. Daimler AG, 727 F.3d 174, 190 & n.24 (2d Cir. 2013)(characterizing the citizenship of the defendants as an "irrelevant factual distinction[]" and concluding that "if all the relevant conduct occurred abroad, that is simply the end of the matter under Kiobel").

United States.  The First Amended Complaint asserts that "Adkins obtained consent in Alabama from Garry Drummond and other Drummond officials to provide substantial support to the AUC."

Assuming, without deciding, that the "relevant conduct" inquiry extends to the place of decision-making—as opposed to the site of the actual "extrajudicial killing"—the allegations in the First Amended Complaint still fall short of the minimum factual predicate warranting the extraterritorial application of the ATS. To begin, the First Amended Complaint fails to allege any facts supporting a purported express agreement between Defendants and the AUC to execute Locarno, Orcasita, and Soler on Drummond's behalf.  Morever, mere consent to support the AUC does not necessarily suggest any conduct in the United States directed at the murders of the union leaders, nor is it indicative of an express quid pro quo understanding that Drummond would finance AUC operations in exchange for the AUC carrying out the killings.  On the contrary, the First Amended Complaint clearly states that the Drummond companies took a side in the civil conflict as early as 1999—two years before the murders.

We are mindful that the First Amended Complaint alleges that Adkins and Araujo attended meetings in Colombia in 2000-2001 where there were discussions of paying the AUC to commit the murders and where money allegedly was paid;

10

also, a meeting in which an AUC leader congratulated AUC members for carrying out the murders of Locarno and Orcasita.  This allegedly occurred in the presence of Adkins and Araujo.  These allegations, if true, are extremely disturbing.  However, the issue is not whether the murders  "touch and concern" the United States, as Plaintiffs suggest, but rather whether the murders "touch and concern the territory of the United States."  Kiobel, 133 S. Ct. at 1669 (emphasis added).

The Court in Kiobel looked to Morrison v. National Australia Bank Ltd., 561 U.S. 247, 130 S. Ct. 2869 (2010), for a discussion of when claims that "touch and concern the territory of the United States" do so "with sufficient force to displace the presumption against extraterritorial application."  Kiobel, 133 S. Ct. at 1669.  Morrison considered the issue whether section 10(b) of the Securities Exchange Act of 1934 has extraterritorial application.  130 S. Ct. at 2875.  In answering this question in the negative, the Court there noted:

> [I]t is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.  But the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever *some* domestic activity is involved in the case.

Id. at 2884 (emphasis in original).

Under the Morrison analysis, the extraterritoriality inquiry turns on where the transaction that is the focus of the statute at issue occurred.  Id.  In Morrison,

11

the focus of section 10(b) was determined to be the place where the securities were purchased and sold (in Australia). See id.  The fact that deceptive conduct originated in the United States did not defeat the presumption against extraterritorial application. Id. at 2884-88.  Importantly, the Supreme Court clarified that "to ask what conduct [the ATS] reaches is to ask what conduct [it] prohibits, which is a merits question.  Subject-matter jurisdiction, by contrast, refers to a tribunal's power to hear a case." Id. at 2877 (internal quotation marks and citation omitted).  Accordingly, the Supreme Court in Morrison proceeded to address whether the allegations in the complaint stated a claim upon which relief could be granted and concluded that they did not because the presumption against extraterritorial application had not been overcome. Id. at  2877, 2883, 2888.  The petitioners asked the Supreme Court to remand the case that had been dismissed for lack of subject matter jurisdiction by the district court. Id. at 2875-77.  After correcting "a threshold error in the Second Circuit's analysis [affirming the district court's dismissal under Rule 12(b)(1)[,]" the Supreme Court declined the petitioners' request to remand the case because "a remand would only require a new Rule 12(b)(6) label for the same Rule 12(b)(1) conclusion." Id. at  2876-77.

Similarly, the question in Sosa, 542 U.S. at 699, 712-13, 124 S. Ct. at 2754, was interpreted by Kiobel as "not whether a federal court has jurisdiction to

12

entertain a cause of action provided by foreign or even international law. The question is instead whether the court has authority to recognize a cause of action under U.S. law to enforce a norm of international law." Kiobel, 133 S. Ct. at 1666. In addition, although the Supreme Court clarified that it was not considering the merits of the petitioners' claim, id. at 1664-69, Chief Justice Roberts nonetheless stated that "[the] petitioners' case seeking relief for violations of the law of nations occurring outside the United States is *barred*." Id. at 1669 (emphasis added). This language, coupled with Kiobel's reliance on Morrison and Sosa calls for dismissal when a claim brought under the ATS for violation of the law of nations fails to overcome the presumption against extraterritoriality.

Turning to the application of the presumption against extraterritoriality, we note that this case is not exactly like either Kiobel or Morrison on its facts. As Plaintiffs point out, Kiobel did not involve a corporate national of the United States or any conduct of the defendants within the United States. While Morrison emphasized where the transaction which is the focus of the statute occurred, the ATS, unlike the Securities Exchange Act, does not itself focus on transactions which occur in any pre-identified type of location.

Here, the law of nations is invoked to seek redress for killings which occurred in Colombia, in the context of a war in which Colombia's military and

13

paramilitary adjuncts allegedly promoted the killing of leftist guerillas and others such as Locarno, Orcasita, and Soler.  While it may be that these murders "touch and concern the territory of the United States" (because of Drummond's alleged involvement), consideration of all facts weighs against a finding that Plaintiffs' claims touch and concern the territory of the United States with sufficient force to displace the presumption against extraterritorial application.  In summary, Plaintiffs' claims are not focused within the United States.

We have considered Plaintiffs' request that this case be remanded to the district court so that Plaintiffs could seek to amend their complaint before the effect of Kiobel is ruled upon.  Plaintiffs assert that new evidence argues for this course of action.  Both sides agree that in February 2013 Jaime Blanco Maya, holder of the food concession contract for Drummond's compound, was convicted of the murders of Locarno and Orcasita in a Colombian court and is now in prison. Regarding the issue of motive, Plaintiffs point to Blanco's ties to members of the AUC.  Defendants point to the fact that the union was lobbying Drummond to take Blanco's lucrative food concession away from him.

Plaintiffs also offer selected quotes from Blanco's 2012 deposition and 2012 declaration, as well as quotes from the 2012 deposition of Jairo Charris Castro and the 2012 declaration of Jose Peinado Martinez.  Charris and Peinado

14

state they were Blanco's employees.  They are now serving time in prison, apparently for their participation in the killings.  These materials were obtained from discovery in a related case, Balcero v. Drummond Co., No. 7:09-cv-1041-RDP (N.D. Ala.) ("Balcero").

The quote from Blanco's deposition states that he does not know for a fact that "the other people" knew about the circumstances of the murders.  Blanco states James Adkins told him the company's President, Garry Drummond, allowed him "a wide handling of the issues."  Blanco states in his declaration that Adkins frequently traveled to the United States; Adkins told him he would bring up the issue of collaboration with the AUC with Garry Drummond.  He states that subsequently, Drummond agreed to fund the AUC.  Blanco also states he had heard Augusto Jimenez state "his satisfaction with the death of the union leaders as this solved a big problem for Drummond."  The excerpts from the deposition of Charris and the declaration of Peinado offer testimony that Adkins told them that the murders of the union leaders were "agreed to" by Garry Drummond.[7]

The foregoing evidence, assuming it is true and that it is admissible, is not enough even in conjunction with the allegations of the First Amended Complaint to establish that, assuming Plaintiffs' claims "touch and concern the territory of

_____

[7]Adkins denies this.

15

the United States," they do so with sufficient force to displace the presumption against extraterritorial application. Plaintiffs' First Amended Complaint paints a picture of violence between two warring factions in Colombia. Drummond elected to back the AUC, which committed acts of violence against leftist guerillas who threatened Drummond's personnel and property. Plaintiffs allege that the AUC killed civilians who they believed were affiliated with the guerillas (including Locarno, Orcasita, and Soler). Certain Colombian nationals have been convicted of committing the murders of Locarno and Orcasita. Assuming arguendo that Drummond was complicit in these murders in the manner described by Plaintiffs (this is denied by Drummond), the allegations and evidence still do not show conduct focused in the United States.

We note in passing that the Kiobel issue does not arise in a vacuum. While there has been no discovery in the instant case, there has been a very large amount of discovery over a period of more than ten years in preceding related cases. These cases include not only In re Juan Aquas Romero v. Drummond Co., Inc., No. CV-03-BE-575-W (N.D. Ala.) (hereinafter "Drummond I"), which is a near mirror image of the instant case, but also the Balcero case which is highly similar. Even with all of this discovery, Plaintiffs have not found evidence of conduct actionable under the ATS because it is focused in the United States.

16

We decline to remand this case so that the district court may consider Plaintiffs' request to amend their complaint. The new evidence described in the briefs which have been filed recently provide sufficient information upon which to base our ruling. Further amendment of the complaint would be futile because it would not allege conduct focused in the United States to a degree necessary to overcome the presumption against extraterritoriality. A remand would also needlessly extend this litigation, which began over eleven years ago. Accordingly, we dismiss Plaintiffs' claims for violation of the law of nations brought under the ATS because the presumption against extraterritoriality has not been overcome.

While the parties' Kiobel briefs do not address this topic, we also observe that in paragraph 81 of the complaint (the First Amended Complaint) Plaintiffs list a large number of treaties, declarations, and conventions which they claim support their cause of action under the ATS. The ATS does recognize violation of "a treaty of the United States" as a potential basis of a cause of action. However, we read the complaint as alleging that these treaties set standards pertinent to defining the cause of action under the law of nations, not that they form a separate basis for their ATS claims. See Kadic v. Karadzic, 70 F.3d 232, 241-44 (2d Cir. 1995) (examining the substance of various treaties to determine whether the alleged offenses are prohibited by universally accepted norms of international law and

thus constitute violations of the law of nations giving rise to a claim under the ATS).

In summary, we dismiss Plaintiffs' claims for violation of the law of nations which are brought under the ATS. In accordance with the recent decision of another panel of this Court in Cordona v. Chiquita Brands International, Inc., No. 12-14898, 2014 WL 3638854 (11th Cir. July 24, 2014) this is a dismissal without prejudice under Rule 12(b)(1), Federal Rules of Civil Procedure, for lack of subject matter jurisdiction.

**PLAINTIFFS' CLAIMS OF ERROR**

Plaintiffs contend the district court erred in finding that all of their claims are barred by res judicata.[8]

**Procedural Background**

**Drummond I**

In 2002, the mothers of eight of the twelve Plaintiffs (the "Mothers") now before us initiated litigation under the ATS and the TVPA, 28 U.S.C. § 1350, for extrajudicial killing and war crimes. The original complaint was filed as

---

[8]Because we have determined that Plaintiffs' claim for violation of the law of nations brought under the ATS is barred (because the presumption against extraterritorial application has not been overcome), we need not address the question whether the same claims are barred by res judicata.

18

Rodriguez v. Drummond Co., Inc., No. 02-CV-665-KOB (hereinafter

"Rodriguez").  It identified the Plaintiffs as "the estates" of Locarno, Orcasita, and

Soler.[9]  The Second Amended Complaint substituted the decedents' wives,

permanent companions, and their children for the estates.  It used pseudonyms to

refer to the wives or permanent companions and their children, for example:  "Jane

Doe I, on behalf of herself and her minor child individually and as heirs of

Valmore Locarno Rodriguez."[10]  The body of the complaint stated that each Doe

Plaintiff sought damages for the harm that Doe Plaintiff had suffered individually,

including emotional harm, loss of consortium, and financial support, "as well as

for the harm suffered by Locarno, Orcasita and Soler leading up to and during

their murders and for their loss of life."

The final, operative complaint (the Third Amended Complaint) was filed on

April 29, 2004.  The style of the case was "In Re Juan Agues Romero v.

Drummond Co., Inc."  The body of the complaint named Drummond Company,

Inc., Drummond Ltd., Garry N. Drummond, and Augusto Jimenez as Defendants.

---

[9]Specifically, the style of the complaint listed the following plaintiffs: the Estate of Valmore Lacarno [sic] Rodriguez, the Estate of Victor Hugo Orcasita Amaya, the Estate of Gustavo Soler Mora, and Sintramienergetica.

[10]The remaining Plaintiffs were identified as Jane Does II through V and John Doe I.

Plaintiffs were identified only by "John Doe" and "Jane Doe" names in the body of the complaint.

The Third Amended Complaint set forth four causes of action: (1) ATS claim based on violation of the law of nations, specifically, extrajudicial killings; (2) TVPA claim based on extrajudicial killings; (3) ATS claim based on denial of fundamental right to associate and organize; and (4) wrongful death claim under the laws of the United States, Alabama and Colombia. Paragraphs 13 through 19 recited that each of the Doe Plaintiffs brought the case "de iure proprio for the damages which [he/she] has suffered as a result of the murder of [the decedent] as well as iure hereditatis for the damages which [the decedent] suffered in the course of and as a result of his murder." Paragraph 20 stated: "As heirs of [the decedents], Plaintiffs John Doe I and Jane Doe I to VI are deemed under Colombian law to be legal successors of these deceased individuals and occupy the place of the aforesaid deceased in this case. In particular, they are the repository of these decedents' rights."

The district court ordered Plaintiffs to file a Notice of Identities under seal which would identify all Plaintiffs. The Notice of Identities was filed contemporaneously with the Third Amended Complaint. It did state the name of

20

each wife/permanent companion[11] and the name of her decedent, but despite the court's direction the children were only identified as, e.g., "the two children of." No children's names were given. It is noteworthy that the Notice of Identities described all of the Doe Plaintiffs as, e.g., "Plaintiff Jane Doe II is (1) Yaneth Baloco Tapia . . . **and** (2) the children of Yaneth and Valmore [last name]." The word "and" is in bold type, clarifying the dual aspect of each Doe Plaintiff.[12] Defendants took the depositions of the wives/permanent companions in April 2005. The 2005 deposition testimony and the 2003 declarations of the same women confirm that all of the first eight Plaintiffs in the instant case were paired with their mothers as Doe Plaintiffs and that their mothers represented them in Drummond I.

Plaintiffs' TVPA and wrongful death claims were resolved in Defendants' favor in March 5 and June 15, 2007 orders granting a motion for summary judgment. The dismissals were with prejudice. Only the Count I ATS claim (based on extrajudicial killings) against Drummond Ltd. and Augusto Jimenez went to trial. During the trial the video deposition of one of the Mothers, Nancy

---

[11]The names listed in the Notice of Identities included the wife of each of the three decedents, plus several permanent companions.

[12]This is the case with each paragraph stating the identities of the Plaintiffs with the exception of Jane Doe IV—in that case, the word "and" is not bolded.

Cordoba Vidal, was played for the jury.  In part, she testified:

> Q.    You understand this lawsuit is being brought on your daughter's behalf?
> A.    Yes.
> Q.    And are you seeking damages in this lawsuit only on your daughter's behalf and on your own behalf as well?
> A.    On behalf of my daughter and on behalf of myself, of course.

Ms. Cordoba also testified about the amount of financial support Orcasita provided to their daughter on a monthly basis.  During closing argument Plaintiffs' counsel argued:  "the families of Valmore, Victor and Gustavo, they're asking you to compensate them and it's in your sole discretion to compensate them, taking into consideration the loss of a father, a husband, and a son."[13]

Drummond I ended on July 26, 2007 with a defense verdict.  Utilizing a special verdict form, the jury found Drummond Ltd. and Augusto Jimenez not liable to any of the Doe Plaintiffs for the killing of any of the three men.  Having done so, the jury left blank the damages sections of the special verdict form as instructed.  Judgment was entered in favor of Defendants on July 30, 2007.  Plaintiffs appealed the district court's rulings, the verdict, and the judgment.  The

---

[13]We take judicial notice of the proceedings in Drummond I.  See United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994) (citing Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388–89 (2d Cir. 1992) (recognizing that a "court may take judicial notice of a document filed in another court . . . to establish the fact of such litigation and related filings") (internal quotation marks and citations omitted)).

22

judgment of the district court dismissing all claims with prejudice was affirmed on

appeal.  See Romero v. Drummond Co., 552 F.3d 1303 (11th Cir. 2008).

**Drummond II**

On March 20, 2009, the instant case ("Drummond II") was filed by eight

Plaintiffs.[14]  These eight Plaintiffs are children of some of the women who

initiated the Drummond I litigation.[15]  Each of these Plaintiffs was paired with

his/her mother as part of one of the "Doe" plaintiffs in Drummond I.  Each was

represented by his/her mother as guardian.[16]

---

[14]The original complaint lists the following eight Plaintiffs:  Freddy Locarno Baloco, through his guardian and representative Yaneth Ester Baloco Tapia; Katherine Paola Lacarno [sic] Baloco, through her guardian and representative Yaneth Ester Baloco Tapia; Ayleen Paola Orcasita Almarales; Stefany Loren Orcasita Cordoba; Marlon Alexi Orcasita Almarales, through his guardian and representative Elisa Almarales Viloria; Ashly Patricia Orcasita Almarales, through her guardian and representative Elisa Almarales Viloria; Sergio Esteban Soler Urrego; Ingrid Karina Soler Urrego, through her guardian and representative Nubia Yolanda Urrego Urrea.

[15]Not all of the children who were included in Drummond I elected to participate in Drummond II.  Furthermore, John Doe (a plaintiff in Drummond I) does not have children who were plaintiffs in Drummond I.

[16]Even though, as we noted in Baloco, Rule 17(c) requires the district court to appoint a guardian ad litem for a minor, this rule only applies when the minor is "unrepresented in an action."  FED. R. CIV. P. 17(c)(2).
It is now clear that the Mothers properly represented their children because no conflicting interests were implicated.  See Burke v. Smith, 252 F.3d 1260, 1264 (11th Cir. 2001) ("[U]nless a conflict of interest exists between the representative and minor, a district court need not even consider the question whether a guardian ad litem should be appointed."); Gonzalez-Gonzalez-Jimenez de Ruiz v. United States, 231 F. Supp. 2d 1187, 1196 (M.D. Fla. 2002) aff'd sub nom. Gonzalez-Jiminez De Ruiz v. United States, 378 F.3d 1229 (11th Cir. 2004) (noting that "[t]ypically, the next friend who sues on behalf of the minor is that minor's parent" and finding that the mother of the minor plaintiffs, as a party to the suit, was not required to bring the action as a "next friend"); see also Croce v. Bromley Corp., 623 F.2d 1084, 1093

23

The original complaint stated that Plaintiffs were seeking damages under the ATS, the TVPA, and the wrongful death law of Colombia for "the harm they have suffered individually," including emotional harm, loss of companionship, and loss of financial support, "as well as for the harm suffered by [their fathers] leading up to and during the murders and for their loss of life."

On May 13, 2009, Defendants filed a motion to dismiss arguing that Plaintiffs' claims were barred by res judicata and that Plaintiffs lacked standing to sue under the TVPA. On November 9, 2009, the district court held that five of the eight children's claims were barred by res judicata[17] and that all eight lacked standing. The motion to dismiss was granted.

On appeal, we reversed the district court's rulings. Baloco, 640 F.3d at 1351. We considered whether the children had standing to sue under the TVPA. As part of that analysis, we examined the TVPA's text[18] and legislative history and

---

(5th Cir. 1980) (holding that the minor was "otherwise represented [because] the child's legal guardian, his mother, brought th[e] action on his behalf").

[17]The court concluded that "the instant complaint is insufficient to provide the necessary identity of three of the remaining plaintiffs."

[18]The relevant part of the TVPA provides as follows:
a) . . . An individual who, under actual or apparent authority, or color of law, of any foreign nation—
(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or
(2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be

24

concluded that the statute permits "appropriate wrongful death claimants to be able to sue *alongside* representatives of the deceased." Id. at 1347 (emphasis in original).  We further determined that the children were, in fact, proper wrongful death claimants under the TVPA because they could be claimants under the wrongful death law of Colombia.  Thus, the children had standing to pursue a TVPA claim for personal damages.  Id. at 1349-50.

We then turned to the district court's holding on res judicata.  We held that the preclusion issues could not be resolved on the face of the pleadings because they were "insufficient to assure us that those asserting claims for the minor children in Drummond I have interests identical to those being asserted by the Children in this action." Id. at 1350.  Accordingly, we reversed the district court and "remand[ed] for further factual development as to the scope, if any, of the Children's involvement in the Drummond I litigation." Id. at 1351.

On remand, on October 7, 2011, the First Amended Complaint was filed.  This is the final, operative complaint in the instant case.  It adds four additional plaintiffs ("New Children") who are also children of the murdered union leaders.[19]

---

a claimant in an action for wrongful death.
28 U.S.C. § 1350 note § 2(a).

[19]These New Children are:  Greysi Paola Locarno Larios; Gustavo Alberto Locarno Larios; Linda Teresa Orcasita Pineda; Vanessa Katherine Orcasita Pisccioty.  It is undisputed that none of the New Children's mothers were parties in Drummond I.  None of the New Children are

It contains the real names of all Plaintiffs.  The same lawyers who were counsel to all Plaintiffs in Drummond I are counsel to all Plaintiffs in this case.

The First Amended Complaint asserts four causes of action on behalf of all Plaintiffs against all Defendants for:  (1) extrajudicial killing under the ATS; (2) war crimes under the ATS; (3) extrajudicial killing under the TVPA; and (4) wrongful death under the laws of Colombia.  Plaintiffs seek damages for their individual harm—including "emotional harm, loss of companionship and financial support," as well as for "the harm suffered by Locarno, Orcasita and Soler leading up to and during their murders and for their loss of life."  All Plaintiffs state that they are heirs and legal beneficiaries of one of the decedents, and that he/she seeks his/her "own personal damages" suffered as a result of his/her father's death.

On November 7, 2011, Defendants moved for dismissal of the First Amended Complaint against the four new Plaintiffs, and for summary judgment against the eight original Plaintiffs (the "Original Children").  On September 12, 2012, the district court granted Defendants' motion to strike the declarations Plaintiffs had filed with their response.  Baloco v. Drummond Co., Inc., No. 7:09-CV-00557-RDP, 2012 WL 4009432, at *9 & n.14 (N.D. Ala. Sept. 12, 2012).  It also granted Defendants' motions and found "all of the children's claims are

minors.

26

barred by res judicata." Id. at *1.  Judgment in Defendants' favor was entered on September 12, 2012.  This appeal was filed on October 11, 2012.

## DISCUSSION

### The Order Striking the Declarations

We review a district court's rulings regarding the admissibility of evidence for abuse of discretion.  Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1281 n.75 (11th Cir. 2008).

We will first consider the appeal of the order striking the new declarations of the Mothers and the Original Children's declarations which were filed in response to Defendants' motion for summary judgment.

Defendants' motion for summary judgment relied on the following pleadings and evidence:  the complaints and the Notice of Identities filed in Drummond I; the Mothers' 2005 deposition testimony; the Drummond I order from March 5, 2007 granting the Defendants' motion for summary judgment as to all TVPA claims against all Defendants and as to the ATS claim against Drummond Company, Inc.; the Drummond I order from June 15, 2007 granting the Defendants' motion as to the claim for wrongful death under Colombian law; the jury verdict form in Drummond I; the July 30, 2007 order in Drummond I dismissing the case with prejudice in accordance with the jury verdict in favor of

27

Drummond Ltd. and Augusto Jimenez; and a transcript of the status conference before the Drummond II district court judge that took place on August 23, 2011.

The record before us also includes the 2003 declarations of the Mothers filed in Drummond I, three of which state the Mothers are bringing suit "for the damages and suffering that my family, including my minor children, has experienced as a result of the assassination of my husband, and on behalf of my husband's estate to which I am an heir." The fourth declaration states that one of the Mothers is seeking compensation "for the damages and suffering that my family has experienced as a result of the assassination of my husband."

In response to the Defendants' motion for summary judgment, Plaintiffs filed a brief in opposition with new declarations of each of the referenced four Mothers and declarations of each of the eight Original Children, seeking to refute Defendants' evidentiary presentation. The Mothers' new declarations uniformly state that they had never intended to comment on their children's legal status in Drummond I, that they had never intended to involve their children in that case, and that the children were not involved in the day-to-day operations of the lawsuit.[20] The declarations of each of the Original Children said, in essence, that

---

[20]In a representative declaration one of the Mothers attests to the following:
1. In Drummond I her children never provided deposition testimony, answered the defendants' written questions, testified at trial, or spoke with counsel;
2. When she testified in Drummond I her family "was still living under threat";

they barely knew, if at all, about the case and that they had never been consulted about it.[21]

The district court struck the Mothers' new declarations, and also the declarations filed by each of the Original Children. Plaintiffs argue that the Mothers' 2003 declarations and their 2005 deposition testimony in Drummond I expressed inadmissible legal conclusions, not facts; also, the Mothers' 2005 deposition testimony is inadmissible hearsay. Plaintiffs also argue that since the Original Children had not previously filed any declarations, the declarations filed in the instant case could not be sham.

In ruling that the declarations were a sham, the district court stated:

3. "[E]very time [she] spoke about or referenced the case, [she] spoke as an individual, not as a lawyer. Thus, [she] was not commenting on [her] rights or those of [her] children as a lawyer, and [she] never intended to comment on [her] children's legal status in the litigation. [She] also never intended to involve [her] children because [she] wanted to protect them";
4. When she brought Drummond I, she "was interested in keeping [her] children as safe as possible and limiting their exposure in the case" and thus she "proceeded using only a pseudonym because [she] feared for [her] safety and the safety of [her] children"; and
5. "[She] did not want [her] children associated with the case in the press or otherwise. Although the Court eventually ordered that [she] disclose [her] real name, [her] intention from the beginning of the case was to limit [her] children's involvement and participation in the case to minimize any danger they may face as a result of [her] claims that the Defendants were responsible for [her] domestic partner's death."

[21]The Original Children's declarations generally include the following: (1) they understand that their respective mothers were involved in Drummond I; (2) they did not provide testimony or answer questions in Drummond I, and they never spoke with counsel in Drummond I; (3) they were not and did not agree to be plaintiffs in Drummond I; and (4) the reasons why they have filed the instant suit.

29

Across the board, those declarations aver that the [M]others never intended to comment on their children's legal status in the case, never intended to involve their children, and that the children themselves were not involved with the day to day operations of the lawsuit. Putting aside that these declarations do not refute the **fact** of representation, to the extent that the declarations attempt to create an issue of fact on the question of intent . . ., they are **STRICKEN** as sham declarations.

Baloco, No. 7:09-CV-00557-RDP, 2012 WL 4009432, at *9 n.14 (citing Van T

Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984)).

The district court did not abuse its discretion.  Plaintiffs' legal arguments are devoid of merit.[22]  The new declarations of the Mothers and the declarations of the Original Children represent a disingenuous effort to create disputed issues of fact.  The same lawyers who prepared the pleadings in Drummond I (and Drummond II), who were present for the Mothers' 2005 deposition testimony in Drummond I, who prepared the Mothers' 2003 declarations in Drummond I, and who argued for an award of damages for the Original Children at the Drummond I trial, now have prepared and presented declarations seeking to disavow the Mothers' intent to represent their children's interests in Drummond I.  We also observe, however, that due to the particular phraseology of the declarations, they

---

[22]The Mothers' depositions are an admissible form of evidence under Rule 56(c) of the Federal Rules of Civil Procedure.  They are an expression of the Mothers' intent to pursue claims for their children.  The deposition excerpts do not constitute hearsay or legal conclusions.  The same reasoning applies to the 2003 declarations.

30

provide no relevant evidence to refute the Mothers' earlier declarations, deposition testimony, or trial testimony that as a matter of fact they represented their children's interests in Drummond I. It is not surprising that Plaintiffs' counsel did not consult the Original Children when they were minors.

In addition to concluding that the district court properly struck the declarations as a sham, we also hold that Plaintiffs are judicially estopped from arguing that the Mothers did not understand themselves to be representing their children. Judicial estoppel is an equitable doctrine invoked at a court's discretion "to protect the integrity of the judicial process." New Hampshire v. Maine, 532 U.S. 742, 749-50, 121 S. Ct. 1808, 1814 (2001) (internal quotation marks omitted). In our circuit, courts consider two factors in the application of judicial estoppel. "First, it must be shown that the allegedly inconsistent positions were made under oath in a prior proceeding. Second, such inconsistencies must be shown to have been calculated to make a mockery of the judicial system." Burnes v. Pemco Aeroplex, Inc., 291 F.3d 1282, 1285 (11th Cir. 2002) (internal quotation marks omitted). These factors are flexible and not exhaustive, and courts should always consider the individual circumstances of a given case. Id. at 1285-86.

The first factor is clearly met by the Mothers' 2005 deposition testimony and their 2003 declarations. As to the second factor, the Mothers' representation

31

of their children in Drummond I was calculated to collect damages for the children and to maximize the damages which could be obtained in that action. Now that the Original Children's claims can be entirely precluded by the doctrine of res judicata, the Mothers have changed their story in an attempt to assert that they "did not understand themselves to have been representing the children in any legal sense [and that] it was not their intention to involve their children in any way." This calculated change of position, in response to the "exigencies of the moment," is precisely what judicial estoppel seeks to avoid. New Hampshire, 532 U.S. at 749-50, 121 S. Ct. at 1814; Burnes, 291 F.3d at 1285.

Accordingly, the district court properly struck the Mothers' declarations as sham, and Plaintiffs are judicially estopped from arguing that the Mothers did not understand themselves to be representing their minor children in Drummond I. In addition, we find the Original Children's declarations irrelevant for our purposes. Because the Original Children were minors represented by their Mothers during Drummond I, it is of no moment that they were not consulted by counsel.

32

**The Order Granting Summary Judgment as to the Original Children's Claims**

We turn now to Plaintiffs' argument that the district court erred in granting Defendants' motion for summary judgment.  The stricken declarations will not be considered in this analysis.

We review the district court's grant of summary judgment de novo construing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences in its favor.  Eli Lilly & Co. v. Air Exp. Int'l USA, Inc., 615 F.3d 1305, 1313 (11th Cir. 2010).  We may grant summary judgment only after determining that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  An issue is not "genuine" if it is unsupported by the evidence or is created by evidence that is "merely colorable" or "not significantly probative."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511 (1986).  A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party.  Id. at 252, 106 S. Ct. at 2512.

"The district court's application of res judicata is a question of law which is reviewed de novo.  However, whether a party is in privity with another for

33

preclusion purposes is a question of fact that is reviewed for clear error."

Griswold v. Cnty. of Hillsborough, 598 F.3d 1289, 1292 (11th Cir. 2010) (internal

quotation marks and citation omitted).

The Original Children's claims are barred by claim preclusion.  Federal

courts must apply federal common law to determine the preclusive effect of a prior

federal court judgment.  Taylor v. Sturgell, 553 U.S. 880, 891, 128 S. Ct. 2161,

2171 (2008).

> The preclusive effect of a judgment is defined by claim preclusion
> and issue preclusion, which are collectively referred to as "res
> judicata."  Under the doctrine of claim preclusion, a final judgment
> forecloses "successive litigation of the very same claim, whether or
> not relitigation of the claim raises the same issues as the earlier suit."
> Issue preclusion, in contrast, bars "successive litigation of an issue of
> fact or law actually litigated and resolved in a valid court
> determination essential to the prior judgment," even if the issue recurs
> in the context of a different claim.  By "preclud[ing] parties from
> contesting matters that they have had a full and fair opportunity to
> litigate," these two doctrines protect against "the expense and
> vexation attending multiple lawsuits, conserv[e] judicial resources,
> and foste[r] reliance on judicial action by minimizing the possibility
> of inconsistent decisions."

Id. at 892, 128 S. Ct. at 2171 (internal citations and footnote omitted).

A subsequent suit is barred under the doctrine of claim preclusion when the

following four elements are present: (1) there is a final judgment on the merits,

(2) the decision was rendered by a court of competent jurisdiction; (3) the same

cause of action is involved in both cases; and (4) the parties, or those in privity

34

with them, are identical in both suits.  I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir. 1986).  It is undisputed that the first two elements are met here.  Thus, res judicata operates to preclude the Original Children's claims here if Drummond I and the instant case involve the same causes of action, and the Original Children were parties, or in privity with parties, to Drummond I.

A number of circuits, including our own, follow the so-called "transactional" approach to determine whether the case before the court asserts "the same cause of action" as the previously litigated case.[23]  Under that approach, "[i]f a case arises out of the same nucleus of operative facts, or is based upon the same factual predicate, as a former action, . . . the two cases are really the same 'claim' or 'cause of action' for purposes of res judicata."  Griswold, 598 F.3d at 1293 (internal quotation marks omitted); see also N.A.A.C.P. v. Hunt, 891 F.2d 1555, 1561 (11th Cir. 1990).  In addition, "[r]es judicata applies not only to the precise legal theory presented in the prior case, but to all legal theories and claims arising out of the same nucleus of operative fact [which could have been raised in the prior case]."  Hunt, 891 F.2d at 1561.

---

[23]See, e.g., Petromanagement Corp. v. Acme-Thomas Joint Venture, 835 F.2d 1329, 1335 (10th Cir. 1988) (applying the transactional approach based on a common nucleus of operative facts to justify a res judicata bar of the new action); Yankton Sioux Tribe v. U.S. Dep't of Health & Human Servs., 533 F.3d 634, 641-43 (8th Cir. 2008) (holding that "a claim is barred by res judicata if it arises out of the same nucleus of operative facts as the prior claim") (internal quotation marks and citations omitted).

35

The tremendous similarity of the detailed factual averments of the Third Amended Complaint in Drummond I and the First Amended Complaint in Drummond II shows that res judicata applies under the transactional test. Furthermore, both complaints assert causes of action for violation of the law of nations under the ATS, for extrajudicial killings under the TVPA, and for wrongful death under the law of Columbia. Thus, claim preclusion operates to bar the Original Children's claims.

Because the nucleus of operative facts and the causes of action are the same in Drummond I and Drummond II, the crux of the claim preclusion issue as to the Original Children's claims hinges on whether they were parties to or in privity with a party in Drummond I.

The district court, while commenting on "the ocean of evidence that the children in this case were in fact the children represented in Drummond I," analyzed the res judicata issue based on a stated assumption (not a finding) that the Original Children were not parties, but rather privies of their mothers and the decedents. Assuming that the children were not parties in Drummond I we agree with the district court's analysis based on the stated assumption. However, based on the uncontroverted evidence in the record, it is clear to us that the Original Children were parties in Drummond I. The contents of the Third Amended

36

Complaint, the Notice of Identities, the 2003 declarations and depositions of the Mothers of the Original Children, and counsel's closing argument at trial all point to the Original Children's status as parties bound by the judgment.[24]  Thus, the doctrine of claim preclusion bars the Original Children from bringing the same claims again.

**The Order Dismissing the New Children's Claims**

We review de novo the district court's dismissal under Rule 12(b)(6) for failure to state a claim, "accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff."  Hill v. White, 321 F.3d 1334, 1335 (11th Cir. 2003) (citation omitted).

We conclude that the New Children's claims are barred by claim preclusion. The TVPA claim is also barred by issue preclusion.

As we determined in the interim appeal, the TVPA's statement that claims for damages may be asserted by a legal representative of the decedent or by "any

---

[24]Normally the identity and representative capacity of a plaintiff is clearly stated in the style of a case.  Unfortunately, this did not occur here.  Instead, the plaintiffs were referred to in the body of the Third Amended Complaint as anonymous Doe Plaintiffs.  Each Jane Doe Plaintiff included a wife or permanent companion of one of the decedents and one or more of their children.  The body of the Third Amended Complaint alleged that the Doe Plaintiffs are heirs of the decedents and that they are "the repository of these decedents' rights."  This terminology, chosen by Plaintiffs' counsel, has legal significance regardless of what was in the minds of the wives and permanent companions concerning their role in the case.  The opinion of Pedro R. Lafont Pianetta, Plaintiffs' expert witness, is that the children's damages of the iure hereditatis variety must be split equally among the heirs (meaning only the children of the decedent).

37

person who may be a claimant in an action for wrongful death" implicates the conflict laws of Alabama and the substantive wrongful death law of Colombia. Baloco, 640 F.3d at 1347, 1349-50. That ruling is the law of the case, and we are bound by it.[25] Were we writing on a clean slate, we might choose a different path.

The Doe Plaintiffs in Drummond I asserted a cause of action under Colombian wrongful death law. The Third Amended Complaint shows that, as part of their wrongful death claim, the Doe Plaintiffs sought two types of damages. First, they sought personal damages for emotional harm, loss of consortium, and loss of financial support for each of the Original Children and for each of their Mothers. The Mothers brought these claims in their capacities as guardians for their children as well as for themselves. Second, the Original Children, acting through the Mothers as their guardians, also sought damages for the pain and suffering experienced by each of the decedents before his death. Thus, the heirs of Locarno who were named in the Third Amended Complaint sought an award of damages on his behalf, representing appropriate compensation for the pain and suffering of Locarno prior to his death. Similar relief was requested on behalf of the heirs of Orcasita and the heirs of Soler.

---

[25]As a practical matter application of foreign law in U.S. courts can be a thorny proposition. While foreign legal experts may well be preeminent in their field, conflicting opinions and translation issues are problematic. Also, the opinion testimony is offered by experts chosen by one side or the other, posing the possibility of bias or selectivity.

The legal basis for this relief under Colombian wrongful death law is explained in the opinion of Pedro R. Lafont Pianetta, Plaintiffs' expert witness, upon which we relied in the interim appeal to establish that the Original Children have standing, as wrongful death claimants, to sue for damages under the TVPA. His opinion is that under Colombian wrongful death law, all persons actually damaged by the decedent's death, including but not necessarily limited to wives, permanent companions, and children of the deceased, may sue for personal damages de iure proprio. In addition, the heirs of the deceased (including children but not wives or permanent companions) may sue for damages sustained by the decedent before his death iure hereditatis. In this regard, Pianetta's opinion states that only the lineal heirs of the decedents may seek such damages; "*the reparation could only be claimed by the heirs, among which in this particular hypothesis, would also be the offspring as sole heirs to the decedent* (citation of source omitted) *with exclusion of the spouses or widows of the decedents.*" (emphasis in original).

The four New Children include two children of Locarno (Greysi Paola Locarno Larios and Gustavo Alberto Locarno Larios) and two children of Orcasita (Linda Teresa Orcasita Pineda and Vanessa Katherine Orcasita Pisciotty). In addition to personal damages, they each seek their share of an award of damages

39

for the pain and suffering of their respective fathers.  None of them was a party in Drummond I.  However, under classic res judicata doctrine,  their claims would be barred by party claim preclusion if they are "privies" of parties who are bound by the judgment in Drummond I.  This requires a specific relationship, "sufficient to create privity," with such a party (i.e., some of the Original Children).  See 3D Moore's Federal Practice § 131.40[3][a] (Matthew Bender 3d ed.) (noting that, despite the amorphous nature of the concept of privity and the fact that the term has been abandoned "in favor of identifying specific relationships between parties and nonparties that may preclude nonparties," privity is "still deeply embedded in claim preclusion doctrine"); see also Richards v. Jefferson Cnty., Ala., 517 U.S. 793, 798, 116 S. Ct. 1761, 1766 (1996) ("the term 'privity' is now used to describe various relationships between litigants that would not have come within the traditional definition of that term.") (citation omitted).  Because there is a close connection between the concept of privity and the notion of identity of interests, the existence of the same rights and interests in property has been recognized as being "specific enough" to create privity for purposes of claim preclusion.  See 3D Moore's Federal Practice § 131.40[3][a]-[c] (Matthew Bender 3d ed.).

Applying pre-Taylor law, it does appear that the New Children were in privity with the Original Children.  See Meador v. Oryx Energy Co., 87 F. Supp.

40

2d 658, 665 (E.D. Tex. 2000) (finding that where estate beneficiaries were "in privity with their common ancestor for a claim belonging to that ancestor, . . . they are also in privity with each other"); see also Wright, Miller & Cooper, 18A Fed. Practice and Procedure §§ 4457, 4461 (2d ed. 2012) (stating that concurrent property relationships likely provide better justification for the application of the virtual representation analysis—which precludes relitigation of issues that had been tried by a party "sharing a substantial identity of interests with a nonparty"—than most other circumstances).[26]

The Supreme Court's decision in Taylor reviewed and clarified the rules of preclusion under federal common law. The general rule is that "'one is not bound by a judgment in personam in a litigation in which he is not designated as a party or to which he has not been made a party by service of process.'" Taylor, 553 U.S. at 884, 128 S. Ct. at 2166-67 (quoting Hansberry v. Lee, 311 U.S. 32, 40, 61 S. Ct. 115 (1940)). However, parties and their privies are bound by a judgment. The Court criticized the term "privity" as vague and conclusory. Id. at 892-93, 128

---

[26]Plaintiffs' contention that pre-Taylor cases should not be relied on is misplaced. While the Supreme Court in Taylor rejected the term "virtual representation," it noted that "[its] decision is unlikely to occasion any great shift in actual practice." Taylor, 553 U.S. at 904, 128 S. Ct. at 2178. The Court recognized that "[m]any opinions use the term 'virtual representation' in reaching results at least arguably defensible on established grounds. In these cases, dropping the 'virtual representation' label would lead to clearer analysis with little, if any, change in outcomes." Id. (internal citations omitted). See also Griswold, 598 F.3d at 1293.

41

S. Ct. at 2171-72.[27]  It then clarified the circumstances in which privity can be found for preclusion purposes, namely: (1) the nonparty agreed to be bound by the litigation of others; (2) a substantive legal relationship existed between the person to be bound and a party to the judgment; (3) the nonparty was adequately represented by someone who was a party to the earlier suit; (4) the nonparty assumed control over the litigation in which the judgment was issued; (5) a party attempts to relitigate issues through a proxy; or (6) a statutory scheme forecloses successive litigation by nonlitigants.  Id. at 893-95, 128 S. Ct. at 2172-73.

    We apply the specific rules set forth in Taylor to determine whether the New Children's TVPA and wrongful death causes of action are barred by claim preclusion.  At least one of the six exceptions must apply to preclude those claims.  The relationship between the Original Children and the New Children and their deceased fathers weighs heavily in favor of finding that the claims of the latter are precluded under the "substantive legal relationship" exception of the Taylor privity analysis.  Certain of the Original Children and certain of the New Children are half-siblings and are the joint offspring of two of the decedents.  While

---

    [27]The Supreme Court commented that "[t]he substantive legal relationships justifying preclusion are sometimes collectively referred to as 'privity.'" Taylor, 553 U.S. at 894 n.8, 128 S. Ct. at 2172 n.8.  Recognizing that there may be some confusion stemming from the use of "[t]he term 'privity[]' . . . as a way to express the conclusion that nonparty preclusion is appropriate on any ground[,]" the Court stated that it would "avoid using the term 'privity' in [its] opinion." Id.

42

familial relationship standing alone is not enough,[28] it is certainly a consideration

where, as here, all children are looking to share in the award of <u>iure</u> <u>hereditatis</u>

damages for their decedent's death as heirs or legal beneficiaries of the estate.[29]

Because the relief requested implicates considerations of property law, successive

awards would be improperly duplicative.  In this case, the causes of action brought

by the Original Children were concluded adversely to them in <u>Drummond I</u>.

Those causes of action cannot be brought again, even if they do not seek <u>iure</u>

<u>hereditatis</u> damages, but only personal damages.[30]  The causes of action are the

same.

As discussed above, the Original Children's wrongful death claim in

---

[28]<u>See</u> Wright, Miller & Cooper, 18A Fed. Practice and Procedure § 4459 (2d ed. 2012).

[29]According to the Notice of Identities, "Colombian law recognizes as heirs an individual's children both by his legal spouse and by any permanent companion."  Thus, all Children are beneficiaries to the same estate.  In fact, Plaintiffs expressly rely on our determination in <u>Baloco</u> that the children are "legal beneficiaries" under Colombian law.  <u>Baloco</u>, 640 F.3d at 1349.

[30]See Restatement (Second) of Judgments § 47 which provides:

When a person has been injured by an act which later causes his death and following his death separate actions are prosecuted, one under a survival statute and one under a death statute:
(1) . . .
(2) A judgment against the plaintiff in the first action precludes any person who was a beneficiary of that action from being a beneficiary in the second action, unless the judgment was based on a defense that is unavailable against that beneficiary in the second action.

Restatement (Second) of Judgments § 47 (1982).

43

Drummond I delineates their status as wrongful death claimants under the TVPA.
As such, they sought relief in the form of two different types of damages stemming
from the same cause of action.  The Original Children lost on both their wrongful
death and TVPA claims when Judge Bowdre dismissed them with prejudice in her
March 5 and June 15, 2007 orders.  That adverse judgment precludes the assertion
of those claims by the New Children;[31] as a result, the New Children are barred
from pursuing any cause of action which seeks damages stemming from the deaths
of their fathers.

In summary, the New Children's TVPA and wrongful death claims are
barred by claim preclusion.  Claim preclusion applies because (1) the New
Children's TVPA and wrongful death claims asserted in the First Amended

---

[31]The circumstances in the present case are distinguishable from Freeman v. Lester
Coggins Trucking, Inc., 771 F.2d 860 (5th Cir. 1985).  In Freeman, the plaintiff initially brought
an action for his own injuries suffered as a result of an automobile accident in which his infant
daughter was killed.  Id. at 861.  After an adverse judgment in the first suit, the father filed a
wrongful death action on behalf of his daughter's mother and siblings for their injuries as a result
of the daughter's death.  Id. at 861-62.  The court found that res judicata was inappropriate "for
close family relationships are not sufficient by themselves to establish privity with the original
suit's party, or to bind a nonparty to that suit by the judgment entered therein."  Id. at 863.

We read Freeman as standing for the proposition that a claimant suing in his individual
capacity in the first action is not precluded from pursuing a later cause of action as the
beneficiaries' legal representative.  Unlike in Freeman, where the only beneficiary to Freeman's
claim for his own injuries was Freeman himself, here, the Original and the New Children were
both beneficiaries of the claims asserted in Drummond I.  Therefore, the adverse judgment in
Drummond I binds all of them; more specifically, it precludes the New Children's claims in the
instant action.  Notwithstanding Plaintiffs' implicit proposition to the contrary, the substantive
legal relationship inquiry turns on the relationship between the parties and not on the alignment
of the types of damages available under the theories of recovery asserted in each proceeding.

44

Complaint are "the very same claim[s]," Taylor, 553 U.S. at 892, 128 S. Ct. at 2171, as those brought by the Original Children; and (2) the New Children are in a substantive legal relationship with the Original Children with respect to the TVPA and wrongful death claims asserted by the New Children because their cause of action seeks certain damages (of the iure hereditatis variety) as heirs or legal beneficiaries of their respective decedents' estates.

The New Children's TVPA claim is also barred by issue preclusion. Issue preclusion bars relitigation of an issue of fact or law that has been decided in a prior suit. Issue preclusion applies when: (1) the issue at stake is identical to the one involved in the prior litigation; (2) the issue was actually litigated in the prior suit; (3) the determination of the issue in the prior suit was a necessary part of the judgment in that action; and (4) the parties are the same or in privity with each other and the party against whom the earlier decision is asserted had a full and fair opportunity to litigate the issue in the earlier proceeding. E.E.O.C. v. Pemco Aeroplex, Inc., 383 F.3d 1280, 1285 (11th Cir. 2004) (citations omitted); I.A. Durbin, Inc., 793 F.2d at 1549 (citations omitted).

In her order dated March 5, 2007, after extensive briefing of the legal and factual issues involved with Plaintiffs' TVPA claim, Judge Bowdre granted Defendants' motion for summary judgment on that claim on the grounds that

45

Plaintiffs had failed to present sufficient evidence of "state action" (involvement of the Colombian government) as required by the TVPA.[32]  That was a necessary part of the district court's determination that Defendants were entitled to judgment as a matter of law on the TVPA claim.  The district court's ruling was affirmed on appeal.  See Romero, 552 F.3d at 1317-18.  As a result, the New Children are precluded from relitigating the "state action" issue in the instant case.

**CONCLUSION**

We affirm the district court's decision to strike the Mothers' declarations submitted along with Plaintiffs' Response opposing Defendants' Motion for Summary Judgment.  We affirm the district court's order granting Defendants' motions to dismiss and for summary judgment on the TVPA and Colombian wrongful death claims.  We dismiss the ATS claims for lack of subject matter jurisdiction under Rule 12(b)(1), Federal Rules of Civil Procedure.[33]

**AFFIRMED.**

---

[32]As pointed out by the district court, the Mothers' (and the Original Children's) interests in litigating this issue were perfectly aligned with the New Children's interests.

[33]Defendants also have requested affirmance of the district court's ruling on the TVPA claims against Drummond Company, Inc. and Drummond Ltd. based on Mohamad v. Palestinian Authority, 132 S. Ct. 1702, 1708-11 (2012) (holding that the TVPA "authorizes liability solely against natural persons").  Defendants correctly cite Mohamad for this proposition, and but for the res judicata ruling the TVPA claim against the two Drummond entities would be dismissed for failure to state a claim.

46